UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| **DANIELLE LARKIN and MIA NEUSTEIN,** *individually and on behalf of all persons similarly situated*, | ) ) ) ) ) |
| **Plaintiffs,** | ) ) |
| v. | **Case No.: 2:23-cv-142-AMM** ) ) |
| **UAB MEDICINE ENTERPRISE,** *formerly known as* UAB Health System, **and UAB HOSPITAL MANAGEMENT LLC,** | ) ) ) ) ) |
| **Defendants.** | ) |

## MEMORANDUM OPINION ON PLAINTIFFS' UNOPPOSED MOTION FOR SETTLEMENT APPROVAL AND ATTORNEYS' FEES AND COSTS

This case is before the court on an unopposed motion for settlement approval and attorneys' fees and costs. Doc. 86. For the reasons stated below, the motion is **GRANTED** and this action is **DISMISSED WITH PREJUDICE**. The court retains jurisdiction to enforce the Settlement Agreement for plaintiffs' unpaid wages claim under the Fair Labor Standards Act, Doc. 86-1.

### I. BACKGROUND

This dispute arises from an employment relationship between plaintiffs Danielle Larkin, Mia Neustein, and collective action members, and defendants UAB Medicine Enterprise ("UAB Medicine") and UAB Hospital Management LLC

("UAB Hospital"). On February 6, 2023, Ms. Larkin and Ms. Neustein filed a putative collective action complaint against the defendants. Doc. 1. Ms. Larkin and Ms. Neustein asserted that the defendants "willfully failed to properly compensate Plaintiffs and FLSA Collective members for all hours worked . . . in excess of forty (40) hours per week," in violation of the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq*. ("FLSA"). Doc. 1 ¶ 56.

These are the facts alleged in the complaint:

Ms. Larkin and Ms. Neustein formerly worked as Nurses for the defendants. *Id*. ¶¶ 5–6. The defendants "implemented the Hospital Kronos Timekeeping System for recordkeeping of time and attendance, vacation and sick days for non-exempt employees, including Nurses." *Id*. ¶ 22. The defendants' Employee Handbook states that "the FLSA requires overtime pay at a rate of one and one-half times an employee's regular rate of pay after 40 hours of work in a work week of seven consecutive days (168 hours)." *Id*. ¶ 59. The Handbook also states that "time worked must be recorded accurately." *Id*. ¶ 45.

Ms. Larkin and Ms. Neustein asserted that the "defendants suffered from a high employee turnover rate and [the hospital] was constantly understaffed." *Id*. ¶ 34. According to Ms. Larkin and Ms. Neustein, the "chronic understaffing . . . required Plaintiffs and other Nurses to work additional/overtime shifts every two to three weeks," which "resulted in workweeks of more than forty (40) hours." *Id*.

"Additionally, Plaintiffs rarely left their shift at the time that defendants scheduled for them to leave, and often stayed late to give report, finish tasks, or assist night shift with medical emergencies." *Id.* ¶ 35.

Ms. Larkin and Ms. Neustein further asserted that "[d]ue to UAB's chronic understaffing and volume of work, Nurses were routinely forced to work through their meal break. . . ." *Id.* ¶ 36. Ms. Larkin and Ms. Neustein alleged that defendants "were not only aware of and permitted this practice [of working through meal breaks], but the work schedules and conditions imposed by Defendants effectively required this practice." *Id.* ¶ 39. Specifically, Ms. Larkin and Ms. Neustein asserted that "[w]hether or not the meal break was taken, Defendants' timekeeping system, Kronos, automatically deducted a thirty (30) minute break from their paychecks." *Id.* ¶ 40.

Ms. Larkin and Ms. Neustein alleged that the "Defendants. . . did not accurately record and track all of the hours worked by Plaintiffs and other Nurses and therefore failed to compensate Plaintiffs and the putative collective members at one and one-half (1½) times the regular rate of pay for hours worked over forty (40) hours in a workweek." *Id.* ¶ 42. In their answer, the defendants denied these allegations. *See* Doc. 47 ¶¶ 31–36, 38–44.

On April 10, 2023, the defendants filed a motion to dismiss, Doc. 25, and on June 30, 2023, Ms. Larkin and Ms. Neustein filed a motion for conditional

3

certification, Doc. 39. On August 2, 2023, the court denied the motion to dismiss, Doc. 44, and the court granted the motion for conditional certification on December 11, 2023, Doc. 53. Four hundred and fifty (450) individuals then opted in to join this lawsuit. *See* Docs. 37–40, 46, 58–70, 73–75. The parties consented to, and the court granted, a motion to stay the case to pursue alternative dispute resolution on April 22, 2024. *See* Docs. 71, 72. Following mediation, the plaintiffs filed this unopposed motion for settlement approval and attorneys' fees and costs on November 22, 2024. Doc. 86.

In their settlement agreement, the parties reached a gross settlement amount of $600,000.00. Doc. 86-1 ¶ 11(G). This includes $300,000.00 in "attorneys' fees and reimbursement of litigation costs," $1,500.00 in "general release payments" to Ms. Larkin and Ms. Neustein, and $6,000.00 in "payment of the Settlement Administration Costs to administer the Settlement." *Id*. Of the net settlement amount[1]—$291,000—"[f]irst, each Settlement Collective Member will receive a minimum payment of $100.00." Doc. 86 at 9. "Second, Settlement Collective Members will receive a *pro rata* portion of the remaining Net Settlement Amount based on the number workweeks in which they worked more than forty (40) hours,

---

[1] The agreement defines the net settlement amount as "the Gross Settlement Amount less Plaintiffs' Counsel's attorneys' fees and reimbursement of litigation costs of Three Hundred Thousand Dollars ($300,000.00), general release payments to the two Named Plaintiffs in the amount of One Thousand Five Hundred Dollars ($1,500.00) each, and the Settlement Administration Costs not to exceed Six Thousand Dollars ($6,000.00), subject to Court approval." *Id*. ¶ 11(H).

4

calculated using actual workweek hours recorded in Defendants' records plus thirty (30) additional minutes per workweek." *Id.*

"Fifty percent (50%) of each Settlement Award shall be deemed payment of alleged unpaid wages, subject to all legally required garnishments, liens, wage withholding orders, regular withholding, and similar obligations, and reported on an IRS Form W-2." *Id.* n.2. "The remaining fifty percent (50%) of each Settlement Award shall be deemed compensation for interest and liquidated damages, shall not be subject to payroll withholdings, and shall be reported on an IRS Form 1099." *Id.*

"Simpluris, a third-party independent company chosen by the Parties will perform all notice and administration responsibilities" including "distribut[ing] all Settlement Awards to each Settlement Collective Member with an accompanying Notice of Collective Action Settlement." *Id.* at 9–10. "Each Settlement Collective Member who cashes their settlement check shall release and discharge the [defendants] for all FLSA wage and hour claims asserted . . . including . . . all overtime and liquidated damages under the FLSA for the time period from the earlier of the three years prior to the filing of their Opt-In Consent Form through the date of execution of the [Settlement] Agreement." *Id.* at 10.

## II.   LEGAL STANDARD

The FLSA provides: "Any employer who violates the provisions of section 206 or section 207 of this title shall be liable to the employee or employees affected

5

in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages." 29 U.S.C. § 216(b). For hours worked in excess of forty in a workweek, an hourly employee must be paid at least one and a half times his ordinary hourly wage. *Id*. § 207(a)(1). The FLSA also "provides for reasonable attorney's fees." *Silva v. Miller*, 307 F. App'x 349, 351 (11th Cir. 2009); 29 U.S.C. § 216(b).

Under controlling precedent, "there are only two ways in which back wage claims arising under the FLSA can be settled or compromised by employees." *Nall v. Mal-Motels, Inc.*, 723 F.3d 1304, 1306 (11th Cir. 2013) (cleaned up). "The first is under the supervision of the Secretary of Labor." *Id*. The second is through a lawsuit, in which "the parties may present to the district court a proposed settlement and the district court may enter a stipulated judgment after scrutinizing the settlement for fairness." *Id*. (cleaned up). The FLSA "requires judicial review of the reasonableness of counsel's legal fees to assure both that counsel is compensated adequately and that no conflict of interest taints the amount the wronged employee recovers under a settlement agreement." *Silva*, 307 F. App'x at 351.

"If a settlement in an employee FLSA suit does reflect a reasonable compromise over issues, such as FLSA coverage or computation of back wages, that are actually in dispute[, the Eleventh Circuit] allow[s] the district court to approve the settlement in order to promote the policy of encouraging settlement of litigation."

6

*Lynn's Food Stores, Inc. v. United States*, 679 F.2d 1350, 1354 (11th Cir. 1982).

## III.  ANALYSIS

The plaintiffs request the court to approve the settlement agreement because it "is fair and reasonable, was negotiated at arm's length through the use of an experienced neutral Mediator, and provides a substantial benefit to the Settlement Collective Members." Doc. 86 at 11. The court examined the proposed settlement for fairness. More particularly, the court considered: (1) whether the settlement constitutes a compromise of the plaintiffs' FLSA claims; (2) the nature of the dispute, including the hours the plaintiffs assert that they worked, the amount they were paid, and whether the settlement amount includes liquidated damages; (3) whether the Settlement Agreement includes any side deals such as a confidentiality agreement or a release of claims other than those under the FLSA; and (4) whether the attorney's fee provided by the settlement is reasonable and free from any conflict of interest. *See Beard v. Dolgencorp, L.L.C.*, No. 7:10-cv-1956-SLB, 2013 WL 12253571, at *4 (N.D. Ala. Mar. 29, 2013).

There is a bona fide dispute between the parties. The plaintiffs alleged that the defendants violated the FLSA. *See* Doc. 1. They alleged that "Nurses were routinely forced to work through their meal break but were not paid," *id.* ¶ 36, and the "Defendants . . . did not pay Plaintiffs or other Nurses for all hours worked in excess of forty (40) hours in a workweek and did not pay proper overtime premiums," *id.* ¶

7

38. The defendants denied these allegations, Doc. 47 ¶¶ 36, 38, and "deny any liability associated with any and all of Plaintiffs' claims," Doc. 86-1 ¶ 8. They assert their "compli[ance] at all times with all applicable state and federal laws." *Id*. "Nonetheless, in consideration of the costs, risks, and burdens of litigation, [the] Defendants have agreed to the terms and conditions set forth in [the settlement] Agreement." *Id*.

In their unopposed motion for settlement approval, the plaintiffs assert that "[t]he Settlement was the result of years of litigation, Plaintiffs' substantial investigation, factual discovery, the review and analysis of documents related to UAB employment and timekeeping policies as well as UAB's timekeeping records, the Parties' arm's-length negotiations, and the work of a respected Mediator who has much experience in mediating FLSA collective actions." Doc. 86 at 13. They assert that the "[s]ettlement was carefully negotiated based on a substantial investigation by Plaintiffs' Counsel and the review and analysis of policy and payroll documents produced by Defendants and documents procured through Plaintiffs' extensive investigation." *Id*. They also assert that

> the proposed Settlement is . . . reasonable as it reflects a reasonable proportion of disputed damages owed to the Settlement Collective Members based on the number of their workweeks at UAB over forty (40) hours, essentially providing each with an additional meal break, which is a reasonable approximation of each Settlement Collective Member's damages, given the evidence that those workers should have been compensated for an additional meal

8

> break during each workweek.

*Id*. at 14. They further assert that "[t]he recovery represents both unpaid wages and liquidated damages in equal amounts." *Id*.

The amount of each plaintiff's share, after the initial $100 distribution, was calculated using two data points: the number of their workweeks at UAB over forty hours and the total net pool of settlement money available. *See* Doc. 86-1 ¶ 17(b). The court is satisfied that these calculations reflect compensation for both lost wages and liquidated damages in equal amounts. *See* 29 U.S.C. § 216(b); *see also Norris v. Manheim Remarketing, Inc.*, No. 2:15-CV-00423-MHH, 2015 WL 5011349, at *1, *3 (N.D. Ala. Aug. 24, 2015) (approving a settlement agreement where "[h]alf of the $3,000.00 settlement payment consist[ed] of unpaid wages, and half consist[ed] of liquidated damages"); *Dixon v. Morris-Shea Bridge Co., Inc.*, No. 2:21-CV-01110-JHE, 2021 WL 5359347, at *1, *3 (N.D. Ala. Nov. 17, 2021) (approving a settlement agreement where "79% of [the plaintiff's] maximum recovery for his claimed unpaid overtime [was] $37,967.16, for which he would be entitled to an equal award of liquidated damages").

Although no hour records were provided for the court's review, the court finds that the compromise is reasonable because the parties represented that they engaged in "substantive informal discovery, including defendants' production to Plaintiffs' Counsel of time and pay records for the Collective Members, which Plaintiffs'

9

Counsel reviewed and analyzed." Doc. 86-1 ¶ 5. Accordingly, the court finds that the proposed settlement reflects a reasonable compromise of the plaintiffs' FLSA claims and the parties' legitimate dispute as to the extent to which the plaintiffs are due relief.

Ms. Larkin and Ms. Neustein have entered into separate settlement agreements with UAB for the release of non-FLSA claims. *See* Docs. 86-4, 86-5. This agreement states, in part, that,

> [i]n exchange for the consideration set forth in this Agreement[, $1,500 each to Ms. Larkin and Ms. Neustein, both plaintiffs] agree[] to release and discharge Releasees finally, forever and with prejudice, from any and all causes of action, claims, rights, damages of any nature, penalties, liabilities, expenses, losses, and issues of any kind or nature whatsoever, whether known or unknown, that [Ms. Larkin and Ms. Neustein have] or may have against the Releasees that arose prior to the date on which [they] executed this Agreement, including without limitation any claims, whether in law or equity, known or unknown, against Releasees relating to [Ms. Larkin and Ms. Neustein's] employment (or alleged employment or joint employment) or termination of employment, including but not limited to claims arising under [several statutes]. . . .

Doc. 86-4 at 4; Doc. 86-5 at 4. The settlement agreement defines "Releasees" as,

> Defendants and their past, present, and future parent companies, corporate members, affiliates, and subsidiaries that employed Settlement Collective Members, and their divisions, predecessors, successors, partners, owners, shareholders, insurers, reinsurers and assigns, and each of their past, present and future officers, directors, trustees, employees, contractors, representatives, plan fiduciaries and/or administrators, benefits plans sponsored or

>administered by Defendants, divisions, units, branches and any other persons or entities acting on their behalf, including any party that was or could have been named as a defendant in the Action based upon the facts alleged in the Action.

Doc. 86-1 ¶ 11(M).

This kind of release is subject to heightened scrutiny because it potentially represents "a 'side deal' in which the employer extracts a gratuitous . . . release of all claims in exchange for money unconditionally owed to the employee." *See Moreno v. Regions Bank*, 729 F. Supp. 2d 1346, 1351 (M.D. Fla. 2010) (cleaned up); *Dees v. Hydradry, Inc.*, 706 F. Supp. 2d 1227, 1238–42 (M.D. Fla. 2010) (finding objectionable the existence of an uncompensated "side deal").

The plaintiffs assert that "the General Release Agreements" are "reasonable in amount and scope, and do not impact the overall fairness of the Settlement." Doc. 86 at 19–20. They assert that "[t]hose agreements only release potential claims that would arise from each of the Plaintiffs' employment relationship with UAB but are not covered by the Settlement or the FLSA claims alleged, and provide only a modest cash payment to the named Plaintiffs in exchange for the releases given." *Id*. at 20. They further assert that "the additional compensation to be provided to the Plaintiffs here are not service awards and are not based on the initiation or prosecution of this FLSA collective action, but are global peace liability releases by Plaintiffs in favor of Defendants." *Id*. As such, they assert that "[t]he General Release agreements

11

confer benefits to each party . . ." and are in line with controlling precedent. *Id.*

Under the particular circumstances of this case—in which the plaintiffs negotiated a settlement with the assistance of counsel, the general releases are limited to the claims Ms. Larkin and Ms. Neustein may have against the defendants prior to the date of executing the settlement agreement, and the defendants are providing an additional $1,500 each in consideration of Ms. Larkin's and Ms. Neustein's assent—the court finds that the releases do not undercut the reasonableness of the settlement. *See Spradlin v. Key Installation Servs., Inc.*, No. 3:23-CV-120-MMH-LLL, 2024 WL 3440132, at *3 (M.D. Fla. July 12, 2024) (finding that a general release that provided for separate consideration and limited claims to those "aris[ing] out of the same nucleus of operative facts . . . through the date [of the] Settlement Agreement" was "sufficiently limited so that it does not affect the overall fairness and reasonableness of the settlement agreement" (cleaned up)) *report and recommendation adopted*, No. 3:23-CV-120-MMH-LLL, 2024 WL 3443874 (M.D. Fla. July 17, 2024); *Caamal v. Shelter Mortg. Co., L.L.C.*, No. 6:13-CV-706-ORL-36KRS, 2013 WL 5421955, at *4 (M.D. Fla. Sept. 26, 2013).

Moreover, the court finds that these general releases are distinguishable from a service award because Ms. Larkin and Ms. Neustein are not receiving an "incentive payment . . . acknowledg[ing] [their] role[s] in prosecuting [this] case on behalf of the class members." *Johnson v. NPAS Sols., LLC*, 975 F.3d 1244, 1248 (11th Cir.

2020) (cleaned up). In contrast, their general releases are supported by consideration outside of the consideration exchanged for the FLSA claims. Accordingly, the court finds that the general releases do not affect the overall fairness and reasonableness of the settlement agreement.

The court next turns to the matter of attorneys' fees. The FLSA "requires judicial review of the reasonableness of counsel's legal fees to assure both that counsel is compensated adequately and that no conflict of interest taints the amount the wronged employee recovers under a settlement agreement." *Silva*, 307 F. App'x at 351. "The starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Bivins v. Wrap It Up, Inc.*, 548 F.3d 1348, 1350 (11th Cir. 2008) (cleaned up). "The product of these two figures is the lodestar and there is a strong presumption that the lodestar is the reasonable sum the attorneys deserve." *Id*. (cleaned up).

The "[p]laintiffs request attorneys' fees and reimbursement of litigation expenses in the amount of $300,000.00" and assert that this "amount is fair and reasonable." Doc. 86 at 15. They assert that "[c]ounsel spent significant time and resources reaching this Settlement." *Id*. at 17. They assert that one law firm representing the plaintiffs, Berger Montague PC, "expended 1,244.7 hours" while another law firm, "Ragsdale LLC expended 28.3 hours," making the "combined

lodestar based on current rates . . . $829,259.50 with litigation expenses of $14,384.22 . . . totaling $843,643.72." *Id*. They assert that this "lodestar does not account for the additional costs and lodestar that will be expended in settlement approval and administration." *Id*. at 17–18. They assert that plaintiffs' counsel applied a significant reduction to reach $300,000.00, making it fair and reasonable. *See id*. at 18. Additionally, they assert that "[c]ounsel assumed a very real risk in taking this contingent fee case, and was prepared to invest time, effort, and money with no guarantee of recovery." *Id*. at 18. Finally, they assert that "[c]ounsel agreed upon the amount of FLSA overtime and liquidated damages to be paid to the Settlement Collective prior to discussing attorneys' fees." *Id*. at 16. As such, they assert that "the recovery of the Settlement Collective was not affected by the amount of fees and costs to be paid to Plaintiffs' Counsel." *Id*.

The court has reviewed declarations from plaintiffs' counsel—the law firms of Berger Montague and Ragsdale—and finds the $300,000.00 in proposed attorneys' fees and costs are reasonable and do not taint the settlement with a conflict of interest. At Berger Montague, senior counsel, who declared the firm's "extensive background in complex commercial litigation, including collective actions under the [FLSA]" billed at $890, associates billed at $595 and $545, and paralegals and legal assistants billed between $285 to $425 per hour. Doc. 86-2 at ¶¶ 3, 20. "The general rule is that the relevant market for purposes of determining the reasonable hourly

rate for an attorney's services is the place where the case is filed." *Am. Civ. Liberties Union of Georgia v. Barnes*, 168 F.3d 423, 437 (11th Cir. 1999) (cleaned up). Although the court finds that Berger Montague's rates are not commensurate with the rates of employment lawyers practicing in the Northern District of Alabama, *see, e.g.*, *McClinton v. Cogency Glob., Inc.*, No. 2:20-CV-543-AMM, 2024 WL 1329777, at *20 (N.D. Ala. Mar. 27, 2024) (relying on affidavits from employment lawyers in which "[t]hree of them declared that the prevailing hourly rates for lawyers handling plaintiff's employment cases range from $375 an hour to $650 per hour depending on the skill of the litigator" (cleaned up)), *aff'd in part, vacated in part sub nom. McClinton v. Capstone Logistics LLC*, No. 24-11261, 2025 WL 1431376 (11th Cir. May 19, 2025), the court finds the rates reasonable because counsel has applied a significant reduction to the fees incurred, effectively making the hourly rates commensurate with local rates. *See infra* pp. 16–17. At Ragsdale, the senior attorney, who founded Ragsdale and declared that the firm has "an extensive background in complex commercial litigation, including collective actions under the [FLSA]" billed at $565, the associate billed at $410, and the paralegal billed at $180 per hour. Doc. 86-3 at ¶¶ 2–3, 6. The senior attorney, M. Clay Ragsdale, has "42 years of litigation [experience] in Alabama state and federal courts." *Id*. at 8. The court finds that these rates are commensurate with the rates of employment lawyers practicing in the Northern District and as such, finds them

15

reasonable.

The declarations establish that both law firms collectively billed 1,273 hours for a combined lodestar of $829,259.50. Doc. 86-2 ¶ 20; Doc. 86-3 ¶ 6. Berger Montague declared that this includes:

> (a) case investigation and research; (b) case planning throughout litigation; (c) preparing the complaint and service waivers; (d) intake and interviews of nursing personnel, as well as questionnaires, document collection, and analysis of same; (e) the Rule 26(f) conference and report; (f) opposing Defendants' novel, and case dispositive, motion to dismiss . . . ; (g) Plaintiffs' motion for conditional certification; (h) issuance of collective notice and interviewing opt-in plaintiffs; (i) administration of opt in process and related filings; (j) preparing written discovery . . . ; (k) ADR discussions, preparing mediation statement, and draft memorandum of understanding; (l) attending mediation and direct negotiations with counsel for Defendants; and (m) preparing the Settlement Agreement and related moving papers for court approval.

Doc. 86-2 ¶ 24. Ragsdale declared that their work includes "(a) case investigation and research; (b) case planning throughout litigation; (c) preparing the complaint and service waivers; (d) reviewing and editing court filings and discovery; (e) discussions and strategy for mediation; and (f) assisting in preparing the moving papers for Court approval of the Settlement." Doc. 86-3 ¶ 8. Both declarations state that "[a]ll of the work described above was reasonable and necessary to the prosecution and settlement of this litigation." Doc. 86-2 ¶ 24; Doc. 86-3 ¶ 8. The extensive work that counsel declared was undertaken is reflected in the docket sheet

16

that spans over a year and a half. As such, the court finds the hours expended reasonable.

"In exercising billing judgment," Berger Montague declared that "personnel who worked less than ten (10) hours on this litigation [were] excluded. . . ." Doc. 86-2 ¶ 21. Additionally, Berger Montague provided two hypothetical charts with reduced hourly rates. *Id*. ¶ 23. The first scenario reduced the lodestar to $489,595.00, while the second scenario reduced the lodestar to $379,540.00. *Id*. Plaintiffs' requested amount—$300,000.00—is lower than both hypothetical scenarios and only constitutes approximately thirty-six percent of the combined lodestar. Moreover, this amount includes jointly incurred litigation expenses—meals, reproduction, printing, DocuSign, postage, computer research, data hosting, communication, mediation fees, the filing fee, and pro hac vice fees—for which both firms provided a breakdown. Doc. 86-2 ¶ 27; Doc. 86-3 ¶ 10. The court finds these litigation expenses reasonable, and in the light of the significant reduction applied to the combined lodestar, finds the requested fee of $300,000.00 reasonable as well.

Further, in both declarations, plaintiffs' counsel state that "[t]he Parties reached an Agreement on attorney's fees and costs on October 30, 2024," which was "[a]fter reaching an agreement at the [July 17, 2024,] mediation on the $300,000

17

settlement amount." Doc. 86-2 ¶¶ 10–11; *see* Doc. 86-3 ¶ 5.[2] The settlement agreement states the same, Doc. 86-1 ¶ 7, and the docket sheet reflects the same, *see* Doc. 80 ¶ 4; Doc. 85 ¶ 2. Because the record reflects that the issue of attorneys' fees was decided over three months after the net settlement amount was decided, the court finds "no conflict of interest taints the amount the wronged employee[s] recover[] under [the] settlement agreement." *Silva*, 307 F. App'x at 351.

## IV.   CONCLUSION

For the foregoing reasons, the plaintiffs' unopposed motion for settlement approval and attorneys' fees and costs, Doc. 86, is **GRANTED** and this action is **DISMISSED WITH PREJUDICE**. The court retains jurisdiction to enforce the Settlement Agreement for plaintiffs' unpaid wages claim under the Fair Labor Standards Act, Doc. 86-1. The Clerk of the Court is **DIRECTED** to close this case.

**DONE** and **ORDERED** this 20th day of June, 2025.



_____
**ANNA M. MANASCO**
UNITED STATES DISTRICT JUDGE

---

[2] The court observes that the Ragsdale declaration seeks an award of "$3,000,000" and understands this to be a typographical error. *See id.*